# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### KNOXVILLE DIVISION

| | | |
|---|---|---|
| COURTNEY ADAMS, as Mother and Next Friend of K.E. and V.E., minor children of Decedent, and KIM HUSKEY, Mother of Decedent and Personal Representative of ESTATE OF AN-THONY EDWARDS, | ) ) ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | NO. 3:17-CV-313 REEVES/POPLIN |
| v. | ) ) | |
| BLOUNT COUNTY, Tenn., BLOUNT COUNTY SHERIFF, JAMES L. BERRONG in his official capacity, LIEUTENANT SCOTT BOYD in his individual and official capacity, DEPUTY JERRY BURNS in his individual and official capacity and DEPUTY JAMES PATTY in his individual and official capacity, | ) ) ) ) ) ) ) ) ) | |
| *Defendants*. | ) ) | |

## MEMORANDUM AND ORDER

In the early morning hours of July 25, 2016, Anthony Edwards and Travis Hickam were walking west on Winchester Drive, a dead-end neighborhood road in Blount County, Tennessee. The two men likely did not know it, but the area they walked through was designated as part of "Zone 4" by the Blount County Sherriff's Department.

Zone 4 was the domain of Deputy Jerry Burns that morning. He had come into work around 7:45 the prior evening, for a shift that ended at 6:00 AM on the 25th. At pre-shift roll call, he saw a "face sheet" for Dylan Tarbett—a wanted man who was last known to be staying on Winchester Drive. Deputy Burns took note and suited up for his patrol.

1

Around 1:00 AM, Deputy Burns was at a Huddle House in south Blount County, when a call came over the radio about three suspicious individuals walking on Doc Norton Road—which is in Zone 4, and close to Winchester Drive. Deputy Michael Bennett, who was assigned to county-wide backup, also heard the call. He arrived first at Doc Norton and looked for the "suspicious" individuals. Finding no one, he turned around and moved on.

Deputy Burns was on his way at this point. From the direction he traveled, he passed Winchester Drive to reach Doc Norton. He surveyed Doc Norton past the area Deputy Bennett had checked; he also came up empty, so he turned around and retraced his steps.

Dylan Tarbett had clearly left an impression on Deputy Burns, and he thought Mr. Tarbett might have been in that group of three "suspicious" individuals, given the proximity of Doc Norton to Winchester. To be sure, he made a turn on to Winchester, where he saw Mr. Edwards and Mr. Hickam walking in his direction down the middle of the road.

Seeing the two men, he turned his car around and came up alongside them, asking for their names and dates of birth. Mr. Hickam complied, but Mr. Edwards was more reluctant. Audibly hesitating, Mr. Edwards told Deputy Burns that his name was "Joe Eldridge," and that he was born on July 87, 1985. Mr. Edwards's obvious misstatement about his birthday piqued Deputy Burns's suspicion, and he found it necessary to pat down Mr. Edwards.

Mr. Edwards quickly switched from hesitation to action—as Deputy Burns went to lay hands on him, he ran. Deputy Burns gave chase, and he was lucky that Mr. Edwards tripped and fell on a curb. Backup was called, and the two men struggled. Mr. Edwards broke free at one point, and Deputy Burns subdued him again.

Backup arrived. The first to appear was Deputy Bennett, and he went to check on Mr. Hickam (who had not left). Deputy James Patty followed closely behind, and went to assist Deputy

Burns in his struggle with Mr. Edwards. The two officers managed to get Mr. Edwards handcuffed and on his feet. They walked Mr. Edwards to Deputy Patty's patrol car.

Up to this point, the story has been easy to tell, because every fact is corroborated or captured on audio or video. The events of the next five minutes defy such easy description, but they represent the heart of this case. In those five minutes, Mr. Edwards's head hit the pavement of Winchester Drive, and he lay there, "bleeding out of his ears," until an ambulance arrived. He was taken to the University of Tennessee hospital, and pronounced dead on July 28, 2016.

Nearly one year later, his mother and fiancée brought suit on behalf of Mr. Edwards's estate and his children, against Blount County and the officers at the scene. Two of those officers, sued in their individual capacities, have moved for summary judgment, arguing they are protected from liability under the doctrine of qualified immunity. Separately, four officers have moved to dismiss the claims brought against them in their official capacity.

For the following reasons, the motion for summary judgment [D. 44] is **GRANTED in part** and **DENIED in part**, and the motion to dismiss [D. 74] is **GRANTED**.

I.    PROCEDURAL BACKGROUND ................................................................. 5

II.  FACTUAL BACKGROUND ..................................................................... 6

a.  Prior Assault ...................................................................................... 6

b.  The Initial Call .................................................................................. 6

c.  The Encounter .................................................................................... 8

d.  The Chase ........................................................................................... 9

e.  The Walk Back to the Car .............................................................. 11

   i.  Officer Accounts .......................................................................... 11

   ii.  Civilian Accounts ....................................................................... 14

f.  The Aftermath .................................................................................. 17

g.  The Investigation ............................................................................. 18

h.  The Autopsy ..................................................................................... 20

III. MOTION FOR SUMMARY JUDGMENT ......................................... 20

a.  Standard of Review ......................................................................... 20

   i.  Summary Judgment ..................................................................... 20

   ii.  Qualified Immunity ..................................................................... 22

b.  Contested Documents ...................................................................... 22

   i.  Hickam Declaration .................................................................... 23

   ii.  Sur-reply ...................................................................................... 25

c.  Constitutional Claims ..................................................................... 26

   i.  False Arrest .................................................................................. 26

   ii.  Excessive Force ........................................................................... 32

   iii. Civil Conspiracy—Falsified Report ......................................... 42

d.  State Law Claims ............................................................................. 44

   i.  Negligent Use of Force ............................................................... 44

   ii.  Battery .......................................................................................... 47

   iii. False Arrest .................................................................................. 48

   iv. Wrongful Death & Pain and Suffering ..................................... 48

IV. MOTION TO DISMISS ........................................................................ 48

V.  CONCLUSION ....................................................................................... 50

# I. PROCEDURAL BACKGROUND

The Plaintiffs in this case are Courtney Adams, who is the Mother and Next Friend of Anthony Edwards's two minor children, and Kim Huskey, who is the Personal Representative of the estate of Anthony Edwards. A complaint was filed on July 24, 2017, alleging six violations of the U.S. Constitution, and six violations of Tennessee state law [D. 1]. On November 22, Plaintiffs amended their Complaint to remove two of the constitutional claims [D. 30].

As it stands, Plaintiffs have alleged four constitutional claims under 42 U.S.C. § 1983:

    i. Unlawful Seizure and False Arrest, against Defendants Burns and Patty, in their individual capacities
    ii. Excessive Use of Force, against Defendant Burns in his individual capacity
    iii. Conspiracy to Falsify the Use of Force Report, against Defendants Burns and Patty, as well as Blount County and Defendants sued in their official capacities
    iv. Failure to Train, Supervise and Investigate, against Sheriff Berrong and Blount County

And six Tennessee state law claims:

    v. Negligent Use of Force, against Defendant Burns and Blount County
    vi. Battery, against Defendant Burns and Blount County
    vii. Pain and suffering damages (including punitives), against Defendant Burns and Blount County
    viii. False Arrest, against Defendant Burns and Defendant Blount County
    ix. Wrongful Death, against Defendant Burns and Defendant Blount County
    x. Negligent Training and Supervision, against Sheriff Berrong and Blount County

On March 22, 2018, Defendants Burns and Patty, in their individual capacities, filed a motion for summary judgment on the claims that pertained to them [D. 44]. After the Court held a case management conference on April 16, 2018, it ordered the parties to mediate [D. 53], but the mediation was unsuccessful [D. 61]. On July 2, 2018, the four officers sued in their official capacities filed a motion to dismiss [D. 74]. The Court granted various motions extending the time for filing responses and replies, and the matter is now ripe.

This order resolves both the motion for summary judgment [D. 44], and the motion to dismiss [D. 74]. The motion for summary judgment on Count 1 (unlawful seizure), Count 3 (conspiracy), Count 8 (false arrest) is **GRANTED**; the motion is **DENIED** on Count 2 (excessive

force), Count 5 (negligent use of force), and Count 6 (battery), Count 7 (pain and suffering), and Count 9 (wrongful death). The motion to dismiss is **GRANTED**.

Trial in this case has been continued until November 19, 2019 [D. 163].

## II.   FACTUAL BACKGROUND

The crux of this case lies in the encounter between Anthony Edwards and Deputies Burns and Patty that occurred in the early morning hours of July 25, 2016. But the story begins on the afternoon of July 24.

### a.   Prior Assault

Plaintiff Courtney Adams was Mr. Edwards's fiancée, and Mr. Edwards was the father of her two children [D. 124-3, ¶ 2]. In the early afternoon of July 24, she drove Mr. Edwards to drop him off near Jacob Road in Walland, Tennessee [*Id.*, ¶ 3]. They were having what she later described as a "minor disagreement"; he wanted to stay and talk further, but she needed to leave [*Id.*, ¶ 4]. As she tried to go, she says Mr. Edwards jumped across the hood of her car [*Id.*]. Travis Hickam, who was with Mr. Edwards later that night, said Mr. Edwards told him his "girlfriend" (presumably referring to Ms. Adams) had "run him over" earlier in the day [D. 46-2, ¶ 3]. Although in a later declaration, Mr. Hickam gave a different account, saying Mr. Edwards told him his girlfriend (again, presumably Ms. Adams) had "bumped" him [D. 124-4, ¶ 4]. The autopsy would reveal rib fractures and contusions in the chest, back, and abdomen [D. 124-1, p. 4].

### b.   The Initial Call

That evening, the officers in the Blount County sheriff's department arrived at work around 7:45 PM to check in for the overnight shift, which began at 8:00 PM and lasted until 6:00 AM the next morning [D. 124-6, p. 11]. At the mandatory briefing prior to the shift (known as "roll call"), the supervisor, Sergeant Scotty Boyd, discussed a suspect, Dylan Tarbett, who was wanted for

assaulting a Blount County Sheriff's Deputy. He was last known to be staying at Winchester Drive [*Id.*, p. 13], although Sergeant Boyd testified that he "didn't have a clue" whether Mr. Tarbett was still there [D. 124-8, p. 11]. Further, Mr. Tarbett, who allegedly possessed a .45 caliber handgun, had threatened to kill any officer who made contact with him [*Id.*, p. 9]. Deputy Burns was assigned that evening to patrol "Zone 4," an area that included Winchester Drive [*Id.*, pp. 14-15]. He said the emphasis on Mr. Tarbett was "real high" that evening [*Id.*, p. 13]

The officers went out on patrol. Just before 1 AM, a call came across the radio, describing three suspicious people walking on Doc Norton Road [D. 124-6, p. 21]. Sevierville Road (a main east-west thoroughfare) intersects with Doc Norton. A driver traveling south on Doc Norton would first hit Patterson Road; if they took a right on Patterson, they would reach the intersection with Winchester Drive, where Dylan Tarbett was reportedly staying. The area around Winchester is heavily patrolled and considered dangerous by officers and residents alike [*see Id.*, p. 22; D. 124-17, p. 4 ("[I]t's a scary place to live, unfortunately")].

Two patrol officers responded to the call—Deputy Burns, who was assigned to that zone, and Deputy Michael Bennett, assigned to provide general backup for the whole county on that night [D. 124-6, p. 22; D. 124-16, p. 14]. Coming from the north, Deputy Bennett arrived first. He traveled south on Doc Norton from Sevierville Road down to Patterson, a distance of less than a mile [D. 124-16, pp. 15-16]. He did not make contact with anyone on Doc Norton, and turned around when he hit Patterson, never reaching Winchester Drive [*Id.*].

At the time of the call, Deputy Burns was to the south, at a Huddle House on US Highway 321 [D. 124-6, p. 21]. After hearing the dispatch, he travelled up Ellejoy Road, which intersects with Patterson to the south of both Winchester and Doc Norton [*Id.*, p. 23]. Just before he reached the intersection of Ellejoy and Patterson, Deputy Bennett came on the radio and reported that he

7

had not made contact with anyone on Doc Norton [*Id.*, p. 22]. Deputy Burns, concerned that the suspicious individuals could include Dylan Tarbett, continued toward the Doc Norton/Patterson/Winchester "clump" [*Id.*, p. 23]. He drove north on Patterson and went past Winchester until he reached Doc Norton and took a right (covering an area not inspected by Deputy Bennett) [*Id.*, p. 24]. Seeing no one, he turned around and went back south on Patterson, the way he had come up, until he reached Winchester and took a left to look for Dylan Tarbett [*Id.*, pp. 24, 26-27].

### c.  The Encounter

As he turned on to Winchester, Deputy Burns saw two men walking toward him in the middle of the road [*Id.*, p. 27]. The men moved to the left as Deputy Burns's patrol car approached; he drove past them and then turned his car around [*Id.*, p. 28]. He saw that one of the men was acting "fidgety" and trying to hide his face with his hands [*Id.*]. Deputy Burns "pulled in" behind the men and turned on his floodlights [*Id.*, pp. 29-30].

Deputy Burns's body camera comes on at this point (although the camera is dark for nearly the entire encounter). Deputy Burns exited his car and addressed both men, asking whether they had been on Doc Norton [D. 124-5, Burns Camera 1, 00:15-00:40[1]]. He then asked Travis Hickam for his name and date of birth, which Mr. Hickam provided [*Id.*, 00:40-00:50]. The other man, in response to the question about his name and date of birth, said his name was "Joe Eldridge," and his date of birth was "7/87/85" [*Id.*, 00:58-01:18]. The man—who is later identified as Anthony Edwards—snickers as he says this, and Deputy Burns, his suspicion aroused, repeats the impossible date of birth back to Mr. Edwards [*Id.*, 01:16-01:22; D. 124-6, p. 30].

---

[1] In the briefs, the parties provide time stamps. For whatever reason, no time stamps appear in the DVD footage provided to the Court. As such, all citations will be with reference to the time that appears on the DVD player (i.e., the minutes-and-seconds entry from the recording, not the time of day the footage was recorded).

The tone of the encounter changes at this point. Deputy Burns orders Mr. Edwards to stand "right there" and asks him to put his hands on the back of his head [D. 124-5, 01:22-01:35]. The body camera audio at this point is indecipherable, and the video is completely dark. The parties dispute exactly what happened.

According to Plaintiffs, after Deputy Burns told Mr. Edwards to put his hands on the back of his head, he asked, "are you going to cuff me?" [D. 124, p. 4]. Then, (again, according to Plaintiffs), Deputy Burns "shouted" at Edwards: "Yeah, I'm cuffing you." [*Id.*]. (According to Defendants, Deputy Burns said he was going to "check," not "cuff," Mr. Edwards [D. 132, p. 10]). It is clear from the body camera that Deputy Burns raised his voice, but it is not certain whether Deputy Burns told Mr. Edwards he was about to "cuff" him [D. 124, p. 4].

### d. The Chase

Mr. Edwards put his hands on his head [D. 124-6, p. 31]. Deputy Burns went to conduct a pat down, and "as soon as [Deputy Burns's] hand hit his pocket, [Mr. Edwards] took off" [*Id.*, p. 32]. A twenty-second chase ensued, and the two men covered about forty to fifty yards until Mr. Edwards fell and Deputy Burns caught up [*Id.*, p. 33; D. 124-6, Burns Camera 1, 01:35-01:55].

Deputy Burns had Mr. Edwards within his grasp, and relative calm prevailed for about forty seconds. Deputy Burns orders Mr. Edwards to put his hands behind his back, and Mr. Edwards responds "I'm trying" [D. 124-6, Burns Camera 1, 01:55-02:35]. But as Deputy Burns gets on the radio, Mr. Edwards briefly frees himself [*Id.*, 02:35-02:45]. Deputy Burns successfully subdues Mr. Edwards, and they yell at each other for the next two minutes—Deputy Burns repeatedly shouts "roll over," and Mr. Edwards responds "I'm trying" (again, this can all be heard on the body camera, but the video is dark) [*Id.*, 02:45-04:45]. After two minutes, Mr. Edwards says he's having a seizure and complains of injuries [*Id.*, 04:45-05:35]. Mr. Edwards asks Deputy Burns to let him

up so they can talk, and Deputy Burns responds that "every time you get up, you run though, and it's making it worse" [*Id.*, 07:05-07:25].

Thirty seconds later, Deputy Bennett arrives as backup [*Id.*, 07:55-08:00; D. 124-16, p. 17]. He later said that when he arrived, it looked like Mr. Edwards was "giving [Deputy Burns] a piggy back ride, but he was still trying to pull away" [D. 124-16, p. 17]. According to his own deposition, Deputy Bennett ran toward the two of them, "yelling commands" [*Id.*].

In Deputy Bennett's body camera video, he quickly exists his cruiser and says something inaudible as he runs towards Deputy Burns and Mr. Edwards [D. 124-5, Bennett Camera 2, 00:16-00:18; *see also* Burns Camera 1, 08:02-08:04]. Mr. Edwards then says "I'm not running, I'm not, he's [expletive] hitting me," to which Deputy Bennett replied "Shut the [expletive] up" [Bennett Camera 2, 00:22-00:23]. Deputy Bennett then asks Deputy Burns "where did the other one go?" [*Id.* 00:31-00:34]. Deputy Burns responds "by my car," and Deputy Bennett runs toward Travis Hickam [*Id.*]. On Deputy Bennett's body camera, Mr. Edwards appears to be lying on the ground (it is unclear whether on his stomach or on his back) while Deputy Burns is on his knees, to Mr. Edwards's left [*Id.*].

After Deputy Bennett leaves, Mr. Edwards says "I had a [expletive] seizure, and you go and just [expletive] hit me in the face. It's [expletive] up" [Burns Camera 1, 08:14-08:20]. Deputy Burns says—to Deputy Patty, presumably, who arrived around the same time as Deputy Bennett—that "every time I get up, he runs" [*Id.*, 08:23; *see* D. 124-14, pp. 23-24]. Around this time, Deputy Burns is able to handcuff Mr. Edwards in the front [D. 124-6, p. 38].

Mr. Edwards asks the officers to call 911 [Burns Camera 1, 08:30-08:35]. One of the officers says "listen to me. You see over here? This is a taser. You do anything I tell you not to do, or don't do something I tell you, you're gonna get lit up, you understand?" [*Id.*, 08:36-08:50].

Deputy Burns says again "every time I get up, he runs" [*Id.*, 08:50-08:52]. Mr. Edwards then says "I try to stand up because I feel like I'm going to pass the [expletive] out" [*Id.*, 08:53-08:56]. The exchange continued as follows:

> Officer: Get up. Stand up.
> Mr. Edwards: I just had a [expletive] seizure man. Oh my god.
> Officer: Get up.
> Mr. Edwards: Oh my god. Oh my god, I'm sorry. I'm sorry. Oh my god.
> Officer: Quit grabbing me. Get up.
> Mr. Edwards: I'm just trying to help myself up. Oh my god. Are you OK, I didn't try to hurt you.

*Id.*, 08:58-09:24.

At this point, the body camera remains on, but it apparently fell off Deputy Burns's body, and nothing can be seen or heard for almost four-and-a-half minutes [*Id.*, 09:24-13:50].

### e. The Walk Back to the Car

Five people, four of them still alive, saw what happened next. Aside from the two officers, Travis Hickam (the other person with Mr. Edwards that night), and Lauren Hatcher (who lived on Patterson Road), witnessed the confrontation. Deputy Michael Bennett, while he was on the scene, testified that he did not witness this part of the altercation [D. 124-16, p. 20]. Because no video is available, the Court will have to reconcile these accounts, first describing the events from the perspective of the officers, followed by the accounts of Ms. Hatcher and Mr. Hickam.

### i. Officer Accounts

Deputies Burns and Patty agree they both escorted Mr. Edwards, in handcuffs, to Deputy Patty's SUV [D. 124-6, pp. 40-41]. But their testimony differs in meaningful ways.

*Deputy Burns*

According to Deputy Burns, he and Deputy Patty both kept Mr. Edwards in their grasp all the way to the SUV, with Deputy Burns on the left, and Deputy Patty on the right [*Id.*, p. 41]. Deputy Burns reached to open the door while maintaining control of Mr. Edwards, but as soon as

he opened the door, Mr. Edwards took off running down Winchester toward Patterson [*Id.*]. Deputy Burns does not know how this happened—"I felt him jerk away from my arm, and he took off running"—and Deputy Patty was no longer holding on to Mr. Edwards [*Id.*, pp. 41-42].

Deputy Burns caught up with Mr. Edwards, grabbed him around the waist, and spun him around in the air [*Id.*, p. 42]. At this point, Deputy Burns was holding Mr. Edwards—who was "flailing"—around the waist, and they were both facing Deputy Patty, who had a Taser [*Id.*, pp. 42-43]. Mr. Edwards, whose feet were on the ground, jumped with both feet and kicked Deputy Patty, making contact with his midsection ("the leg, the nuts, the stomach, something") [*Id.*, p. 43].

The momentum from the kick pushed Deputy Burns backward, and both he and Mr. Edwards fell to the ground [*Id.*, pp. 43-44].

Although Deputy Burns "felt a momentum going backward," he and Mr. Edwards did not *fall* backward[2] [*Id.*, p. 44]. Deputy Burns does not know how exactly they hit the ground, but when he got up on his knees, Mr. Edwards was lying with his back on the ground [*Id.*, p. 45]. Deputy Patty then "c[a]me right on and put his knee on his chest with the Taser" [*Id.*].

When he was at the scene, Deputy Burns spoke with Deputy Bennett about the incident: "I didn't think he'd take off running again when me and [Officer] Patty had him—got him out to the back of this vehicle" [Burns Camera 2, 4:40-4:47]. Deputy Bennett interjects, "Oh, he tried to run again?" [*Id.*, 4:46-4:47]. And Deputy Burns responds, "Yeah, when we got him out to the back of the car. That's when I grabbed him right there...I went to pick him up and pull him back and that's when, like, he fell. He fell right on his back" [*Id.*, 4:48-5:00]. "Jim [Patty] had his Taser out getting ready to taze him" [*Id.*, 5:10-5:14].

---

[2] "When he's going backwards, basically, it's just like a drop. His momentum is going, and he goes in front of me, basically where he's at, and then I go right beside him, and I fall down with him on my knees. So we didn't go backwards" [D. 124-6, p. 44].

*Deputy Patty*

According to Deputy Patty, except for the initial encounter, he never laid a hand on Mr. Edwards the entire night [D. 124-14, p. 26]. Contradicting Deputy Burns, he said that he walked a "couple of steps behind" Mr. Edwards and Deputy Burns on the way to the SUV [*Id.*]. Further, Deputy Patty testified that Deputy Burns walked on Mr. Edwards's right side, as opposed to the left [*Id.*]. When they arrived at the car, Deputy Patty said he walked ahead of the pair and opened the door himself, contradicting Deputy Burns (who said he was the one to open the door) [*Id.*, pp. 26-27]. Mr. Edwards never reached the car; at some point after the door was open, Mr. Edwards took off running back down Winchester, towards Patterson [*Id.*, p. 28].

Deputy Patty did not catch up to Mr. Edwards [*Id.*, p. 29]. Deputy Burns did, and grabbed Mr. Edwards (whom Deputy Patty described as "little" and "skinny") around the waist, in a "bear hug" [*Id.*, pp. 29-30]. Mr. Edwards's feet were "slightly" off the ground [*Id.*, p. 30]. Mr. Edwards was kicking his feet, "like a kid having a temper tantrum" [*Id.*].

Deputy Patty had his Taser out, and was getting ready to deploy it in order to "bring Mr. Edwards under control" [*Id.*]. He faced Mr. Edwards and started to speak to him, but words failed when Mr. Edwards raised both of his feet and "deliberately kicked" Deputy Patty in the groin [*Id.*].

Deputy Patty bent over after being kicked, and when he looked up, he saw Deputy Burns "push[] Mr. Edwards slightly down and out" (contradicting Deputy Burns, who does not describe a "push") [*Id.*, p. 31]. Mr. Edwards came down "more or less" in the direction of Deputy Patty, who was still facing the two men [*Id.*, p. 32] Even though he testified that Mr. Edwards was pushed forward, Deputy Patty testified that Mr. Edwards landed on his back [*Id.* ("His body kind of slid down and he hit what I thought was flat on his back")].

### ii. Civilian Accounts

*Lauren Hatcher*

Lauren Hatcher lived off Patterson Road at the time of the incident [D. 46-12, ¶ 2]. Ms. Hatcher signed a sworn declaration, and was later deposed by Plaintiffs' attorney Troy Bowlin. [D. 46-12; D. 124-17]. She also provided a written statement to investigators from the sheriff's office on July 26, which said she left the scene and returned home once Mr. Edwards was hand-cuffed [D. 137-1]; if true, the written statement casts doubt on her declaration and deposition, where she indicates that she saw the events leading up to Mr. Edwards hitting the ground.

Around 1:00 AM, she was outside walking her dog (her normal routine) when she heard a commotion [D. 46-12, ¶ 3]. In her declaration, Ms. Hatcher asserts she saw "two gentlemen [one of whom was a police officer] fighting in the middle of the road" [*Id.*]. She saw the gentleman "hit and kick" the police officer; when the police officer tried to get him, the gentleman "darted away" [*Id.* ¶ 5]. By the time the other officer arrived, one of the officers grabbed the gentleman from behind; more officers (she does not specify how many) arrived and walked Mr. Edwards[3] to the car, at which point he tried to run again [*Id.*, ¶ 6]. She never saw any police officer hit or strike the gentleman, and indicated her feeling that nothing was "intentional." Rather, this was a case where the officer was "just trying to get the gentleman under control and the gentleman would not coop-erate" [*Id.*, ¶¶ 7-8]. Continuing, "[i]t appeared the police officer and the gentleman got their feet tangled up and they fell to the ground. There was no force involved. It just looked like two people tripping and they just fell over. From what I saw the officer did not toss him to the ground. I did not see the gentleman's feet fly up in the air and it just seemed like they both fell down" [*Id.*, ¶ 9].

---

[3] Ms. Hatcher does not identify Anthony Edwards in the declaration, and does not indicate that she knew him. This is the only paragraph where she refers to him by name, rather than to a "gentleman" [*see* D. 46-12, ¶ 6].

In her deposition testimony, Ms. Hatcher testifies that Officers Burns and Patty[4] both escorted Mr. Edwards to the car, with Deputy Burns on the left, and Deputy Patty on the right (which is consistent with Deputy Burns's testimony)[5] [D. 124-17, p. 17]. She could not tell who opened the car door, but she was pretty sure it was Deputy Patty [*Id.*, p. 21]. Contradicting the testimony of both officers, Ms. Hatcher testified that Mr. Edwards kicked[6] Deputy Patty when he opened the door. In her version of events, Mr. Edwards does not first run away from the officers until Deputy Burns catches up with him [*Id.*].

Deputy Burns and Mr. Edwards then "got tangled," and that's when they fell [*Id.* p. 23]. From what she observed, Ms. Hatcher said "it looked like the police officer was trying to save him from falling and hitting the concrete." Continuing, she said it appeared "the police officer was trying to save himself too from, you know, from either one of them getting injured. He was trying to help them both" [*Id.*].

*Travis Hickam*

Travis Hickam was with Mr. Edwards on the night of the incident, and remained at the scene after Mr. Edwards was taken to the hospital.

Mr. Hickam appears on Deputy Bennett's body camera [D. 124-5, Bennett Camera 2]. When giving his statement, Mr. Hickam says that after Mr. Burns asked for his name and date of birth, he went to sit down, per Deputy Burns's instructions [*Id.*, 17:22-17:32]. After Mr. Edwards

---

[4] In the deposition, Ms. Hatcher refers to the two officers on the scene as "Officers 1 and 2," based on the order they arrived. From the description she gives, Officer 1 is likely Deputy Burns and Officer 2 is likely Deputy Patty; to make for easier reading, the Court will refer to Deputy Burns as "Officer 1" and Deputy Patty as "Officer 2."

[5] D. 124-6, p. 41.

[6] Because her view was obscured, Ms. Hatcher did not actually see the kick itself, but inferred it based on what she could see. This is her full account: "You seen—when—I seen his thigh come up—I mean, it's an automatic reaction, if you're going—when police officer number 1 had him kind of—you know, when he had him by the shoulders, was fixing to put him in the cop car, you seen Mr. Edwards's leg come up. I mean, you seen his thigh from the back of the car. You seen him push back. You seen the way that his back come back. And then when the police officer grabbed him in a bear hug, it looked like their feet got entangled, because they had stepped a few feet back, and they both fell" [D. 124-17, p. 22].

ran, Mr. Hickam stayed "on the front of the police car the whole time," although he (in a joking tone) said "he did holler and ask the [officer] if he wanted some help" [*Id.* 17:40-17:48; *see also id.* 19:56-20:08 ("I wasn't getting any closer, because [the officer] asked me to stay where I was...I seen him tackle [Mr. Edwards], and after that I stayed where I was supposed to be")].

Mr. Hickam has also sworn to two declarations. In the first declaration, signed[7] on February 28, 2018, he said the officer "wrestled around" with Mr. Edwards, who then ran away and was caught again [D. 46-2, ¶ 12]. He did not see the final altercation, because it was "too dark and too far away" [*Id.*, ¶ 14]. While he "did not see everything that happened," "[Mr.] Edwards was not doing what he was told to do," and he did not see any officer hit Mr. Edwards [*Id.* ¶¶ 13, 15].

The second declaration was signed on August 23, 2018 [D. 124-4]. Mr. Hickam's description of the incident in this declaration differs substantially from his account in the first. In this declaration he says he was sitting on the curb when "he could hear a scuffle and [Mr. Edwards] begging for his life, begging the officer to stop hitting him" [*Id.*, ¶ 11]. He ran toward the noise so he could see what was happening, and "saw [Officer] Burns standing over [Mr. Edwards], hitting him with both fists" [*Id.*, ¶¶ 12-13]. Deputy Burns told him to get back to the curb, and he complied [*Id.*, ¶ 13]. Deputy Bennett and Deputy Patty arrived at that time [*Id.*, ¶ 14].

Mr. Edwards was in handcuffs at this point, and "was doing what he was told to do" [*Id.*]. Officers Patty and Burns took Mr. Edwards to a police car—Mr. Hickam could not see what happened because the car blocked his view, but he heard a "scuffle" [*Id.*, ¶ 15]. He ran over again and saw Mr. Edwards on the ground "clearly unconscious," with the two officers standing over him [*Id.*, ¶ 16]. He acknowledged he gave a statement that night, but indicated he did not say Deputy Burns hit Mr. Edwards in that statement, because he was "afraid" [*Id.* ¶ 19].

---

[7] Mr. Hickam cannot read, so both declarations were read to him and signed by both Mr. Hickam and the witness who read the declaration.

The second declaration also casts doubt on the veracity of his first declaration. According to Mr. Hickam, he was in the Sevier County jail in February 2018 when the Blount County investigator, Tim Hutchison, asked for his statement [*Id.*, ¶ 20]. Mr. Hickam said Mr. Hutchison offered to "get [him] out of there" in return for providing a sworn declaration [*Id.*]. Mr. Hutchison showed video from the night of the incident, but Mr. Hickam felt "things had been taken out of the video" [*Id.*, ¶ 21]. He told Mr. Hutchison what he remembered, and Mr. Hutchison "came up with a statement for me to sign," but he "did not make the statements as written" [*Id.*]. Mr. Hickam was released a few days later, and was told the charges against him had been dropped [*Id.*, ¶ 22].

In April 2018, Plaintiffs' lawyer Troy Bowlin met with Mr. Hickam, and read the prior statement he gave to Mr. Hutchison aloud [*Id.*, ¶ 23]. Mr. Hickam explained which parts of the statement did not match with what he remembered telling Mr. Hutchison, or what he remembered from the night of the incident [*Id.*, ¶ 24].

### f. The Aftermath

When Sergeant Boyd[8] arrived at the scene, he saw Mr. Edwards, handcuffed, laying on the ground, with his feet on the grass and his back on the concrete [D. 124-8, p. 16]. "He had blood coming from his ears," and his eyes were open; recognizing the severity of the injury, Sergeant Boyd called for medical assistance [*Id.*].

He went to speak with the other officers, and spoke first with Deputy Burns, who said (in Sergeant Boyd's retelling) "[Mr. Edwards] was fighting us, and just to be crude, said he double kicked Shrimper[9] in the balls" [*Id.*]. Deputy Burns then said he "pulled [Mr. Edwards] back" and "dropped him" [*Id.*]. Sergeant Boyd then went to speak with Deputy Patty, who said "you know,

---

[8] Scott Boyd is now a Lieutenant, but was a Sergeant on the night of the incident. For consistency, the Court will refer to him by the title he had on that night.
[9] Deputy Patty. "Shrimper" is a nickname.

Jerry [Burns] slammed him [*Id.*, p. 17]. Clarifying, Sergeant Boyd asked "did he slam him or did he drop him[?]" [*Id.*]. Deputy Patty confirmed—"he slammed him" [*Id.*].

Sergeant Boyd returned to Deputy Burns. This is how he described their conversation:

> I go back to Jerry and I said, okay, Jerry, I said did you slam him or did you drop him, and he said, well, it was more of a slam. I said, okay. I said, well, don't change your wording on this. I mean, it is what it is. It was the heat of the battle. You were fighting. If you slammed him, you slammed him. If you dropped him, you dropped him. Don't think you're going to get into trouble because you're changing your wording here [*Id.*].

### g. The Investigation

At 1:42 AM, Detective Douglas Davis was notified that he should head over to the intersection of "Winston"[10] and Patterson Road [D. 124-7, p. 1]. When he arrived, he saw Mr. Edwards "bleeding out of his ears." He first spoke with Sergeant Boyd, and then Travis Hickam, who knew Detective Davis. Another investigator took measurements and photographs of the scene, and they departed at 2:58 AM for the University of Tennessee hospital [*Id.*]

At the hospital, a Dr. Popsiech (no first name is given) told Detective Davis that Mr. Edwards would not survive his injures. According to Dr. Popsiech, Mr. Edwards's "skull was fractured in the rear near the spinal cord" and he had suffered "severe brain injury" from only one event of trauma to the back of the head. She had been told that Mr. Edwards had fallen backward and hit his head on the asphalt. When Detective Davis asked if the injury was consistent with that report, Dr. Popsiech said it was not—if he "had been on a ladder or fence," a fall could have caused the injury, but that it would take more force than simply falling backward to cause the injury Mr. Edwards suffered [*Id.*].

Detective Davis was told by his supervisor not to interview the officers present at the scene that night, but "to finish what [he] was doing and go home." At 8:45 AM on the 25th, he met with

---

[10] Presumably, he meant to write "Winchester."

the criminal investigation department to go over the case, and then later went to the district attorney's office [*Id.*, p. 2]. The next day, he discovered that Lauren Hatcher had posted about the incident on Facebook, and he went looking for her. As Detective Davis described the post, Ms. Hatcher said she saw Mr. Edwards "hitting and kicking the officer." When another officer arrived, they walked Mr. Edwards to the police car and he tried to run; one officer caught Mr. Edwards from the rear and wrapped his arms around him. It "appeared the two of them got their feet tangled up and they tripped and fell to the ground." "[Mr.] Edwards [sic] head hit the curb...and then more officers began to arrive so she went back home". Ms. Hatcher wrote out a statement (the one included in the sur-reply [D. 141-1]), and Detective Davis departed [D. 124-7, p. 2].

On July 27, he went back out to the scene with an investigator. They observed a "lead" from a Taser in the grass, indicating "where some of the altercation had occurred." They also found a syringe, which Detective Davis believed was dropped by Travis Hickam (based on evidence from the video where he could "see Hickam hid something") [*Id.*].

On July 28, 2016, an administrative review was initiated by Deputy Chief Tom Spangler [D. 124-11, p. 6]. He conducted a review of the general order for "Use of Force" and discovered no violations [*Id.*, p. 3]. He found that "[w]hile Deputy Burns did take Edwards to the ground, it was not a takedown that would lead a reasonable person to believe it would cause serious bodily injury" [*Id.*, p. 3-4]. Continuing, he wrote that "[w]hen Deputy Burns took Edwards to the ground, his intention was to again take control of Edwards after he assaulted Deputy Patty" [*Id.*, p. 4]. In conclusion, he found "the actions of Deputy Burns were not malicious or intentional," and did not cause the death of Anthony Edwards" [*Id.*, p. 5]. He recommended exoneration for Deputy Burns, and that "no further action be taken" [*Id.*].

### h. The Autopsy

Detective Davis was also present at the autopsy [D. 124-7, p. 1; D. 124-15, p. 3].

Dr. Amy Hawes, a Knox County Assistant Medical Examiner, prepared the final autopsy report [D. 124-1], and submitted a sworn affidavit summarizing her findings [D. 124-15]. "Significant" findings included "blunt force injuries of the head that are consistent with an accelerated fall on the back of the head" [D. 124-1, p. 2]. Dr. Hawes's declaration defines an "accelerated fall" as one where the "force applied...is greater than or in addition to the force of gravity that causes you to hit the ground" [D. 124-15, p. 3]. The autopsy discloses multiple contusions around the head, and two "linear, full-thickness fractures" to the occipital bone, located at the base of the skull [D. 124-1, p. 4; D. 124, p. 7]. Mr. Edwards also tested positive for high amounts of controlled substances such as morphine, clonazepam, and methamphetamine [D. 46-4, p. 11]. Dr. Hawes determined the blunt force injuries to the head were the cause of death, and the manner of death was homicide [D. 124-1, p. 2].

## III.   MOTION FOR SUMMARY JUDGMENT

### a.  Standard of Review

#### i.    Summary Judgment

Summary judgment is proper only if the record shows there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine if a reasonable jury could find in the nonmoving party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

The moving party bears the initial burden of showing that there is no genuine issue of material fact on any element of the other party's claim or defense. *Stiles ex rel. D.S. v. Grainger*

*Cty.*, 819 F.3d 834, 847 (6th Cir. 2016). To determine if this burden is satisfied, the Court must consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," in the light most favorable to the nonmoving party and drawing all justifiable inferences in that party's favor. *Adams v. Metiva*, 31 F.3d 375, 378-79 (6th Cir. 1994) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant has satisfied its initial burden, the other party must show a genuine issue of material fact still exists. *Stiles*, 819 F.3d at 847. In doing so, the non-moving party may not rely on the pleadings alone, but must point to "specific facts" in the record that create a genuine issue for trial. *Metiva*, 31 F.3d at 378-89.

In ruling on a motion for summary judgment, the Court need not scour the record "to establish that it is bereft of a genuine issue of fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). The Court does not weigh evidence, judge witnesses' credibility, or decide the truth of the matter, and any genuine disputes of fact that do exist must be resolved in favor of the nonmovant. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249; *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014). Yet when there is a videotape capturing the events, the court must view the facts in the light depicted by the videotape. *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 378-81 (2007)); *see, e.g.*, *Standifer v. Lacon*, 587 F. App'x 919, 920 (6th Cir. 2014) ("The story below, therefore, is [the plaintiff's] except where the police dash-cam video...refutes it").

Ultimately, "[t]he critical inquiry for a district court is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Miller v. Calhoun Cty.*, 408 F.3d 803, 812 (6th Cir. 2005) (*citing Anderson*, 477 U.S. at 251-52).

### ii. Qualified Immunity

42 U.S.C. § 1983 provides a federal cause of action against state officials for the deprivation of constitutional rights under color of state law. But only certain defendants can be held liable for damages in a § 1983 suit. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The plaintiff bears the ultimate burden of proving that a defendant is not entitled to immunity. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).

To determine if a particular defendant is qualifiedly immune from civil liability, the Court must decide (1) whether, viewing the facts in favor of the party seeking to defeat immunity, the defendant violated a constitutional right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct. *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *Perez v. Oakland Cty.*, 466 F.3d 416, 426 (6th Cir. 2006). A right is "clearly established" if it would be clear to a reasonable officer that the conduct would be unlawful in the situation faced. *Saucier*, 533 U.S. at 201. The Court may address these prongs in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

### b. Contested Documents

The record in this case is voluminous and the facts are hotly disputed. So it is unsurprising that the parties have argued over what facts the Court may consider, and the Court needs to settle these arguments before ruling on the motion.

The first contested document is the declaration of Travis Hickam, submitted by Plaintiffs in their response to the motion for summary judgment [D. 124-4]. The second is a sur-reply filed by Plaintiffs in opposition to the motion for summary judgment [D. 137]. An exhibit—the written statement given by Lauren Hatcher to Detective Davis on July 26, 2016—is attached to the sur-reply [D. 137-1]. For the following reasons, the Court will allow both Mr. Hickam's declaration and the sur-reply (along with the accompanying exhibit) to be considered.

### i.      Hickam Declaration

In their motion for summary judgment, Defendants included, as an exhibit, a declaration signed[11] by Mr. Hickam on February 28, 2018 [D. 46-2, p. 3]. Plaintiffs have also included a declaration, made by Mr. Hickam on August 23, 2018, as an exhibit. This declaration contradicts some of what Mr. Hickam said in the first declaration [D. 124-4]. In reply, Defendants argue the Court should not factor the second declaration into its ruling [D. 132, pp. 22-23].

As support for their position, Defendants cite to a Sixth Circuit rule that "a party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts [her] earlier deposition testimony." *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997) (citing *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986)).

The need for this rule is apparent from an example. In *Penny*, the plaintiff, to make a claim under the Americans with Disabilities Act, needed to show he had an impairment that rose to the level of a disability. *Id.* In his deposition, the plaintiff said that during the period of time he was allegedly impaired, he was able to go hunting and fishing. *Id.* Realizing this testimony might undermine his disability claim, he then submitted an affidavit claiming these hunting and fishing trips

---

[11] Mr. Hickam cannot read, so both declarations were read aloud to him, and signed by a witness in his presence.

did not require him to walk. *Id.* The court applied the rule from *Reid* and said the later affidavit could not be used to create a genuine issue of material fact. *Id.*

It is clear from the case law that the rule applies to situations where a party realizes its own deposition testimony undermines its claim, and attempts to dig its way out by generating later testimony in order to manufacture a "dispute of material fact". In all the appellate cases, the prior testimony at issue is a deposition, while the later testimony is an affidavit, *submitted by the same party*. In fact, it appears the rule might be limited to this exact scenario; because the deponent can be cross-examined, while an affiant cannot, the former testimony is necessarily more credible. *See Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969). Thus, "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984) (quoting *Perma Research & Dev. Co.*, 410 F.2d at 578).

In this case, there are two key distinctions: i) both exhibits are sworn declarations, and ii) the declarations are submitted by separate parties. Defendants do cite to a footnote from an unreported case similar to this one, where a district court did not consider a second affidavit (submitted by plaintiff) that contradicted an earlier affidavit (submitted by defendant). *See Deleva v. Real Estate Mortg. Corp.*, No. 1:04-CV-1299, 2007 U.S. Dist. LEXIS 45136, at *72 n. 21 (N.D. Ohio June 21, 2007). This Court, of course, is not bound by that footnote.

The submission of a contradictory declaration does not automatically create a dispute of fact, requiring the Court to deny summary judgment. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson* 477 U.S.

at 247-48 (emphasis in original). It is to be expected that parties will marshal whatever evidence they can in support of their position. In this case, it just happens that both parties have relied on testimony from the same person. *Id.* at 255; *see Aerel S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006) ("the post-deposition affidavit should be considered unless the issue raised by the contradictory affidavit constituted a sham") (cleaned up).

The addition of the second declaration will not befuddle the Court and make it incapable of identifying a *genuine* issue of material fact. Thus, the *Penny* rule—which applies in cases where one form of testimony is considered inherently more credible than another—should not apply in this circumstance, where the declarations are the same in form and a jury is equipped to weigh the question of credibility. The second Hickam declaration [D. 124-4] will be considered.

### ii. Sur-reply

Next, the Court must decide whether it will consider Plaintiffs' sur-reply (and the attached exhibit). Plaintiffs sought leave to file a sur-reply, and it was granted [D. 135, 136]. Defendants have responded to the sur-reply, but argue the sur-reply should not be considered because it fails to address "new reasons and new evidence," citing *Seay v. Tenn. Valley Auth.*, 339 F. 3d 454 (6th Cir. 2003) [D. 141]. *Seay* addresses situations where the Court *must* allow a party to reply under FED. R. CIV. P. 56(c), even if a reply is not expressly allowed under the local rules; to wit, under *Seay*, additional briefing must be allowed if "new reasons and evidence" have been submitted. 339 F.3d 454, 481. The local rules accommodate this exception by allowing limited briefing without court approval in light of "new developments." *See* Local Rule 7.1(d).

But *Seay* is inapplicable in the converse case, where there have not been "new developments," but a party simply desires to file an extra brief. In that case, the decision lies within the

Court's discretion. The Court has already granted leave to file the sur-reply and Defendants have responded. That is enough, and the accompanying briefs and exhibits will be considered.

### c. Constitutional Claims

Defendants move for summary judgment on Plaintiffs' three[12] federal constitutional claims, arguing they are entitled to qualified immunity under § 1983 for each claim. The following claims will be addressed in order. First, Plaintiffs contend Defendants violated Mr. Edwards's right to be free from unlawful seizure under the Fourth Amendment (which the Court will call the false arrest claim), and separately, his right to be free from an unreasonable seizure under the Fourth Amendment (the excessive force claim). Finally, Plaintiffs also argue Defendants conspired to violate their constitutional right of access to the courts.

#### i. False Arrest

Under the Fourth Amendment, a state actor may arrest ("seize") a person if they have probable cause to suspect the person has committed a crime, or they may perform an "investigative detention" of a person if they have reasonable suspicion the person is engaged in criminal activity. Both Deputy Burns and Deputy Patty say they are entitled to qualified immunity on the claim for false arrest because their actions—even when disputed facts are construed in favor of Plaintiffs— did not violate a constitutional right that was clearly established at the time, because they had probable cause to detain Mr. Edwards.

An investigative detention is permissible when it is based upon "specific and articulable facts," which, when taken together with rational inferences from those facts, give rise to a "reasonable suspicion" that the individual is engaged in criminal activity, was engaged in criminal activity, or is about to be engaged in such activity. *U.S. v. Foster*, 376 F.3d 577, 584-85 (6th Cir.

---

[12] There is a fourth constitutional claim brought against Sheriff Berrong and Blount County that is not at issue here [D. 30, ¶¶ 85-100].

2004) (cleaned up). Because probable cause has not been established, the investigative options available to the officer in an investigative detention are limited and circumstantial—such a stop does not necessarily carry with it the authority to even conduct a pat-down search. *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005) (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

In assessing the legality of an investigative detention, the court considers the "totality of the circumstances," and it judges the reasonableness of the stop against an "objective standard," asking: Based on the facts available to the officer at the moment of seizure, would a person of reasonable caution believe that the action taken was appropriate? *Foster*, 376 F.3d at 585 (quoting *Hurst*, 228 F.3d at 751); *see also Bennett*, 410 F.3d at 822 (officer required to articulate specific facts to warrant the belief that the officer's safety or the safety of others was in danger).

To make an arrest, the Fourth Amendment requires the officer to show they had probable cause to believe the suspect was engaged in criminal activity. *Lyons v. City of Xenia*, 417 F.3d 565, 573 (6th Cir. 2003). The proof required to establish probable cause is greater than "reasonable suspicion," but less onerous than the kinds and degree of proof necessary for a conviction; thus, the validity of the arrest does not depend on whether the suspect actually committed a crime. *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).

Whereas reasonable suspicion simply requires the officer to show an objectively reasonable belief that "criminal activity" was afoot, probable cause requires the officer to justify the arrest based on a specific offense. The court must ask whether the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person in believing that the suspect has committed, is committing, or is about to commit an offense. *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1010-11 (6th Cir. 1999) (quoting *DeFillippo*, 443 U.S. at 36)). It is "clearly established" that probable cause determinations involve "an examination of all facts and circumstances *within*

*an officer's knowledge at the time of arrest*." *Id.* at 1012 (citing *Carroll v. U.S.*, 267 U.S. 132, 162 (1925) (emphasis in original).

Plaintiffs concede that the initial encounter between Mr. Edwards and Deputy Burns—where the officer asked for his identification—was lawful [*see* D. 124, p. 19]. They also do not contend that Deputy Burns's decision to chase after Mr. Edwards was unlawful *per se* [*Id.*]. Instead, they argue the unlawful seizure occurred when Deputy Burns went to "cuff" Mr. Edwards and conduct a pat-down search [*Id.* pp. 18-19; D. 132, p. 10; *see* D. 124-5, 01:22-01:35]. Shortly thereafter, Mr. Edwards decided to run[13] [*Id.*, p. 19]. And because there was no reason for Deputy Burns to "cuff" Mr. Edwards, Plaintiffs argue it was unlawful for him to give chase and further detain Mr. Edwards.

As an initial matter, the Court does not conclude from the body camera evidence that Deputy Burns ever said he would "cuff" Mr. Edwards. While the audio is difficult to hear, it sounds like Deputy Burns says he's going to "check" Mr. Edwards. Because he was not going to "cuff" Mr. Edwards, Deputy Burns does not need to show he had probable cause for an arrest during the initial phase of the stop.

Deputy Burns cites to three different statutes that he contends gave him probable cause for an arrest. TENN. CODE ANN. § 39-16-502(a)(2)(A) (false report); *Id.* § 39-16-602(a) (evading arrest); *Id.* § 39-16-603(a) (obstruction of law enforcement).

Under the "false report" statute, it is unlawful to "make a...statement in response to a legitimate inquiry by a law enforcement officer concerning a material fact about an offense or incident within the officer's concern, knowing that the report or statement is false[.]" *Id.* § 39-16-502(a)(2).

---

[13] Deputy Burns recalled this moment as follows: "I said, I'm going to pat you down. I'm going to pat you down, make sure you don't have any weapons. And I went behind him, and he put his hands on top of his head like he was going to let me pat him down, and as soon as I patted his pocket, he took off running" [D. 124-6, p. 30].

The State must show the person making the statement acted "with the intent to obstruct or hinder the officer from preventing the offense or incident from occurring or continuing to occur, or apprehending or locating another person suspected of committing an offense[.]" *Id.* § 39-16-502(a)(2)(A)-(B). Thus, a person cannot be guilty of making a false report just because they know the statement is false. The statute narrows the range of illegal conduct to knowingly false statements made *about* an offense or incident, *with the intent* to obstruct or hinder the officer from preventing that particular offense or incident from occurring or continuing to occur.

The facts are interpreted in favor of the party seeking to defeat immunity. *Perez*, 466 F.3d at 426. The most persuasive fact in Deputy Burns's favor is that Mr. Edwards gave an impossible birthdate—"7/87/85" [D. 124-5, 00:58-01:18]. Mr. Edwards is hesitant in his speech and laughing while he says this; Deputy Burns, audibly skeptical, repeats the date back to Mr. Edwards [*Id.*, 01:16-01:22; D. 124-6, p. 30].

The manifest lie satisfies the first element for the crime of false report—a knowingly false statement. To be convicted, the defendant must also have made the false statement about an offense or incident, with the intent of obstructing the officer from learning about the offense or incident.

The Tennessee Court of Criminal Appeals upheld a conviction under this statute in a case where the defendant—driving on a suspended license—was stopped by an officer for speeding, and gave a false name and date of birth after he failed to produce a driver's license. *State v. Hicks*, No. M2013-1410, 2014 Crim. App. LEXIS 640, at *2-3 (Tenn. Ct. Crim. App. June 26, 2014). The State argued a conviction under the false report statute was warranted, because the defendant gave the false information in the hope that the officer would simply issue a speeding ticket and not find out about the suspended license. *Id.* at 19. The court agreed, and found that a jury was entitled

to find the response to the officer's inquiry was intended to permit the defendant to continue driving on a suspended license. *Id.* at 19.

In this case, there was an outstanding warrant for Mr. Edwards [D. 46-3; D. 124-6, ¶ 6]. Thus, under *Hicks*, a Tennessee jury could legally convict Mr. Edwards of making a false report if it found that he made the statement to prevent Deputy Burns from discovering the outstanding warrant. Deputy Burns did not know of the outstanding warrant when he first encountered Mr. Edwards, but he is not being held to the standard of a prosecutor in court. To find probable cause for the arrest, Deputy Burns's conduct is evaluated against the standard of a "prudent person" acting with the knowledge available to the officer at the time. The question is whether Deputy Burns had sufficient evidence, based on what he knew at the time, to believe Mr. Edwards had made a false statement with the intent of preventing Deputy Burns from finding out about his warrant. *See Estate of Dietrich*, 167 F.3d 1010-12.

The Court is hesitant to extrapolate from *Hicks* and conclude that probable cause had arisen for an arrest under the false report statute at the moment Mr. Edwards gave the (definitely) false birthday and the (probably) false name. But because Mr. Edwards provided a clearly false birthday, and hesitated in giving his name (suggesting that it was false as well), Deputy Burns certainly had grounds to reasonably suspect Mr. Edwards might be trying to cover something up.

At a minimum, a temporary detention for further investigation was then warranted, to ensure that Mr. Edwards was not concealing another crime. *See Foster*, 376 F.3d at 585-86 (affirming district court conclusion that, based on factors known to officers at the time, "the scope of the initial stop could properly be expanded...an officer may temporarily detain someone after completing the pat-down in order to 'investigate the circumstances that provoke suspicion'") (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984)).

It is clear from the audio that very little time passed between the moment when Mr. Edwards gave the fake birthday, when Deputy Burns exited his vehicle, and when Mr. Edwards fled. It is also clear that Deputy Burns had not been able to complete his investigation into Mr. Edwards's obvious lie. Thus, Deputy Burns had reasonable suspicion to detain Mr. Edwards up until he fled. Once Mr. Edwards bolted, Deputy Burns developed the further probable cause needed to make an arrest for a false report. By so quickly running away, a prudent person could reasonably believe that Mr. Edwards had an "intent to obstruct or hinder" Deputy Burns from preventing an offense or incident from occurring. TENN. CODE ANN. § 39-16-502(a)(2)(A).

Because Mr. Edwards had already concealed a material fact, and because his hesitation and almost immediate attempt to flee would lead a prudent person to believe that Mr. Edwards was trying to hinder Deputy Burns from discovering a crime, there was probable cause to believe Mr. Edwards had violated Tennessee's false report statute.

In conclusion, viewing the facts in the light most favorable to Plaintiffs, the Court finds Deputy Burns had reasonable suspicion to conduct an initial investigative detention of Mr. Edwards, and that probable cause for an arrest developed when Mr. Edwards tried to run. Because Deputy Burns had the necessary probable cause, no constitutional violation occurred, and Deputy Burns is entitled to qualified immunity on the false arrest claim.

Deputy Patty is also entitled to qualified immunity on this claim. "Effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for their transmitted information." *U.S. v. Barnes*, 910 F.2d 1342, 1344 (cleaned up); *see U.S. v. Blair*, 524 F.3d 740, 751 (6th Cir. 2008) (citing *Barnes* for the "unremarkable proposition" that one officer may conduct a *Terry* stop based

on information from another officer). Because Deputy Patty arrived at the scene in the midst of his fellow officer's altercation with Mr. Edwards, he could seize Mr. Edwards so long as Deputy Burns was allowed to do so, which he was.

In conclusion, the motion for summary judgment by both Deputy Burns and Deputy Patty is **GRANTED** on the false arrest claim.

### ii. Excessive Force

Next, Plaintiffs claim that Deputy Burns[14] used an excessive (that is, unreasonable) amount of force when he seized Mr. Edwards. In the context of an arrest, investigatory stop, or other seizure, courts determine whether the force used was excessive under an "objective reasonableness" standard. *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 606 (6th Cir. 2006) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)). To determine whether the force used to effect a particular seizure is "reasonable" under the Fourth Amendment, a court must conduct a careful balancing of the "nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interest. *Graham*, 490 U.S. at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).

Deputy Burns raises the shield of qualified immunity. The Court will first address whether—interpreting the facts in Plaintiffs' favor—the force used to effect the seizure amounted to a constitutional violation, and if so, whether Deputy Burns violated clearly established law in committing that violation.

---

[14] In their motion, Defendants argue that both Deputy Burns and Deputy Patty are entitled to qualified immunity on the excessive force claim. The Court will not address whether Deputy Patty is entitled to qualified immunity for any excessive force claim, because Plaintiffs never brought an excessive force claim against Deputy Patty [*see* D. 30, ¶¶ 53-69; D. 124, p. 32].

*Constitutional Violation*

The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat. *Graham*, 490 U.S. at 396. But the officer must act within the confines of the Fourth Amendment, and the force used must be reasonable. A court should take into account several factors to determine whether the officer behaved reasonably, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest. *Id.* (citing *Garner*, 471 U.S. at 8-9); *see Solomon v. Auburn Hills Police Dep't*, 389 F.3d 167, 174 (6th Cir. 2004) ("[T]he definition of reasonable force is partially dependent on the demeanor of the suspect") (quoting *Minchella v. Bauman*, 72 F. App'x 405, 408 (6th Cir. 2003)).

But that list is not exhaustive, and ultimately the question is whether the "totality of the circumstances" justifies the seizure. *Baker*, 471 F.3d at 606-07. The Court analyzes the circumstances in "segments," and "judge[s] each [segment] on its own terms to see if the officer was reasonable at each stage." *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996) (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994); *see Russo v. City of Cincinnati*, 953 F.2d 1036, 1044-46 (6th Cir. 1992) (finding qualified immunity for officers on two uses of Taser, but denying immunity for deadly force with gun, during the same encounter). Thus, the fact that Mr. Edwards had already attempted to flee, along with the Court's determination that the seizure itself was reasonable, does not automatically anoint Deputy Burns with a halo of reasonableness that lasts through the rest of the encounter.

Initially, Defendants cast doubt on whether Deputy Burns even caused Mr. Edwards's death, and contend that "Plaintiff has not and cannot present proof that it was due to any force that [Officer] Burns used in the field" [D. 132, p. 21]. This argument is quickly dispatched. The final

autopsy report says Mr. Edwards suffered injuries during an altercation with police, and finds that the cause of death was "blunt force injuries to the head," these injuries were "consistent with an accelerated fall on the back of the head," and the cause of death was "homicide" [D. 124-1, p. 2]. The doctor at the hospital found the head injuries were caused by a single traumatic event [D. 124-7, p. 1]. Even Deputy Burns admits that Mr. Edwards fell on his head [D. 124-6, pp. 43-44].

Defendants suggest, alternatively, that Mr. Edwards could have died from the injuries he suffered the prior afternoon, in the argument with his fiancée [*see* D. 132, p. 21]. Even if Defendants were correct, it would not be sufficient to grant the motion for summary judgment on this basis. Plaintiffs need not dispel alternative interpretations of the facts, they must simply show a jury could infer in their favor from the facts that the force used by Deputy Burns caused Mr. Edwards's death, and they have done so through the autopsy report.

The two most contentious questions in this case are whether—interpreting the facts in the light most favorable to the plaintiff—Mr. Edwards posed an "immediate threat" to the officers, and whether Mr. Edwards was actively resisting or attempting to evade arrest. *Graham*, 390 U.S. at 396. Because the jury could find Deputy Burns used deadly force, the Court must adjust the dial on the *Graham* factors. Unlike the "typical" case, when deadly force is used, the court must not simply consider the threat faced by the officer—the finding of a threat is a *minimum requirement* that must be met to find in the officer's favor. *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (quoting *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005)) (emphasis added). And it cannot just be any threat: "Deadly force may only be used if the officer has probable cause to believe that the suspect poses a threat of severe physical harm." *Id.* (quotation marks omitted).

When he first came upon the scene, Deputy Burns described Mr. Edwards as "fidgety" [D. 124-6, p. 29]. Deputy Burns was also particularly concerned that Mr. Edwards might in fact be

Dylan Tarbett, who could have a firearm, and was known to be staying on Winchester Drive [*Id.*]. (This fact is in dispute—Sergeant Scotty Boyd, the shift supervisor that night, "didn't have a clue" where Dylan Tarbett was [D. 124-8, p. 11].)

It is undisputed that Mr. Edwards was handcuffed by the end of the altercation, and there is nothing in the record suggesting that he was armed. Deputy Burns, Deputy Patty, and Lauren Hatcher all say that Mr. Edwards kicked (or, at least, attempted to kick) Deputy Patty, which is what caused Mr. Edwards to fall to the ground. But the two officers also both agree that Mr. Edwards kicked at Deputy Patty while Deputy Burns had him in his grasp.

The officers' size in comparison to the suspect is also a relevant consideration. *See Solomon*, 389 F.3d at 174 (finding that officers faced "no immediate threat" when each was at least 5'8" tall and 230 pounds, while plaintiff was 5'5" and weighed 120 pounds). Deputy Burns was about 220 to 225 pounds at the time [D. 124-6, p. 43]. Mr. Edwards—whom Deputy Patty described as "little" and "skinny"—was 141 pounds and 5'6" tall [D. 124-1, p. 3; D. 124-14, p. 29-30]. Deputy Patty himself weighed about 300 pounds [D. 124-14, p. 3].

The Court, viewing the facts in Plaintiffs' favor, finds that a "severe" threat did not exist when a handcuffed, unarmed suspect attempted to kick an officer twice his size, while he was in the clutches of another officer who weighed about eighty pounds more. Because Deputy Burns responded with deadly force, this finding alone should be sufficient to find a constitutional violation. But to be thorough, the Court will also weigh the other two factors considered in *Graham*— Mr. Edwards's attempts to evade the arrest, and the severity of the crime at issue.

It is clear from the record that Mr. Edwards had previously tried to evade arrest. But the fact that Mr. Edwards previously attempted to escape does not necessarily mean it was objectively reasonable for Deputy Burns to think Mr. Edwards was trying to escape when the "slam" or "fall"

took place. *See Dickerson*, 101 F.3d at 1161. There is, of course, no video of this incident, so the most reliable testimony comes from the depositions. Both officers testified they were walking back to Deputy Patty's car with Mr. Edwards in handcuffs. The officers do not agree on who had hold of Mr. Edwards, but they both say Mr. Edwards ran away from the car, and that Deputy Burns caught up with him, grabbing Mr. Edwards around the waist.

But this testimony is contradicted by Ms. Hatcher, the witness at the scene.[15] In her telling, Mr. Edwards kicked at Officer Patty when he was opening the door [D. 124-17, p. 10, 21]. Under this account, Mr. Edwards never tried to escape a second time. And, according to the officers' own testimony, Mr. Edwards had on handcuffs, which a jury could infer impeded Mr. Edwards's ability to escape or resist arrest, especially with three officers present on the scene. Viewing the facts in the light most favorable to the plaintiffs, a finder of fact could reasonably conclude that Mr. Edwards might not have been resisting arrest at all, and that even if he were resisting, it was highly unlikely he would actually escape.

Deputy Burns also did not have an objectively strong reason to believe Mr. Edwards had committed a severe crime that justified deadly force. The initial call concerned three "suspicious" people, but the information from that call was never corroborated. Deputy Burns subjectively believed that Dylan Tarbett was one of those three individuals. Yet the objective reasonableness of that belief is in genuine dispute, so the supposedly violent criminal tendencies of Mr. Tarbett (who had allegedly attacked a police officer) would not validate Deputy Burns's use of force when viewing the facts in the light most favorable to the plaintiffs.

---

[15] The record shows that Ms. Hatcher generally takes the side of the officers. Detectives reached out to her after she made a supportive Facebook post in response to people who were "bashing some of the officers" [D. 124-17, p. 8]. Later in the deposition, she said "I stood up for the police officers because that's what they deserve. That stupid son of a bitch messed up. He should have done what he was supposed to do, and he should have let himself get arrested, get into a cop car. Guess what: He'd still be here today" [*Id.*, p. 22].

The escape itself may have been a crime, and officers are entitled to consider felonies committed by a fleeing suspect after the flight has commenced in determining the appropriateness of deadly force. *See Godawa v. Byrd*, 798 F.3d 457, 466 (6th Cir. 2015). As discussed, Defendants argue Deputy Burns had probable cause to arrest Mr. Edwards for three crimes: false report (a Class D felony[16]), obstruction of law enforcement (a misdemeanor[17]), and evading arrest (a Class E felony punished by confinement of at least 30 days[18]). The Court has already found Deputy Burns had probable cause for the false report arrest, which also carries the most severe punishment of these three crimes. *See* Tenn. Code Ann. § 40-35-112 (prescribing a sentence of at least two years for a Class D felony).

Further, it is undisputed that Mr. Edwards had tried to evade arrest during the encounter, so Deputy Burns likely had probable cause to arrest him for that crime as well, and an attempt to evade arrest can be serious in certain contexts. *See Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 156 (6th Cir. 2013) (taking into account plaintiff's guilty plea for wanton endangerment and fleeing or evading "in the first degree"). Taken in isolation, the crimes for which Mr. Edwards could have been arrested—had he survived—exhibit a patina of "severity."

But, "[i]f there is a per se rule in this area, it is that the 'totality of the circumstances' governs every case." *Id.* at 155 (quoting *Garner*, 471 U.S. at 8-9). So while it is problematic that Mr. Edwards likely concealed his identity from the Deputy Burns to avoid arrest, and attempted to flee, that does not necessarily justify the use of deadly force, especially when the facts are viewed in Plaintiffs' favor. *Godawa*, 798 F.3d at 466 (finding that "with the exception of fleeing and

---

[16] Tenn. Code Ann. § 39-16-502.
[17] *Id.* § 39-16-602.
[18] *Id.* § 39-16-603.

evading arrest," district court should have disregarded probable cause for attempted murder, first degree assault, and wanton endangerment when viewing facts in favor of plaintiffs).

The totality of the circumstances—again, considering the facts in Plaintiffs' favor—are as follows. Deputy Burns and Mr. Edwards only met because Deputy Burns had a hunch that a wanted suspect was staying on Winchester Drive. Apart from the obvious lie, and the attempt to flee, Deputy Burns had no reason to suspect Mr. Edwards of committing a serious, much less violent, crime. Mr. Edwards was unarmed, handcuffed, and in the grasp of an officer much larger than him when he lifted his legs up to kick Deputy Patty, and a third officer was nearby in case matters got out of hand. The threat faced was not severe, and the risk of flight was minimal. These are not the circumstances that justify the use of deadly force, and for that reason, the Court finds that a constitutional violation occurred.

Because the Court finds there was a constitutional violation, it must determine whether Deputy Burns acted in violation of clearly established law.

*Clearly Established Law*

In the context of the right to be free from excessive force, the "clearly established law" prong of qualified immunity should not be defined "at a high level of generality." *White v. Pauly*, 137 S.Ct. 548, 552 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, it must be "particularized" to the facts of the case; unless the violation was obvious, a court needs to identify another case where an officer acting under similar circumstances was held to have violated the Fourth Amendment. *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). This specificity is especially important in the Fourth Amendment context, where "it is sometimes difficult for an officer to determine how the relevant legal doctrine...will apply to the factual situation the officer confronts." *Mullenix*, 136 S.Ct. at 308 (quoting *Saucier*, 533 U.S. at 205).

In a prior Sixth Circuit decision, *Baker v. City of Hamilton, Ohio*, two plaintiffs, Troy Baker and Jesse Snader, sued the same police officer for alleged violations in separate incidents. 471 F.3d 601, 602-03 (6th Cir. 2006). In Mr. Baker's case, the officer saw him come out of the bushes with his arms up, indicating surrender—the officer responded by hitting Mr. Baker in the head with a baton. *Id.* at 603. Almost a year later, that same officer arrived at a different scene and met Mr. Snader. *Id.* at 604. After seeing the officers, Mr. Snader ran. *Id.* The officer gave chase, yelling "[s]top, or I'll shoot," and Mr. Snader slowed down, screaming "I'm stopping, I'm stopping." *Id.* The officer backed down, keeping the gun in his holster, and turned to his trusty weapon of choice, hitting Mr. Snader in the head with a baton. *Id.*

The district court granted summary judgment for the defendants on all claims, and both Mr. Baker and Mr. Snader appealed. *Id.* at 604-05. The appeals court reversed the grant of summary judgment on both the excessive force claims of Mr. Baker (who had not resisted at all), and Mr. Snader (who had initially resisted when he ran). *Id.* at 608-10.

Writing in 2006, the court held it is clearly established that there is a "right of people who pose no safety risk to the police to be free from gratuitous violence during an arrest." *Id.* at 608 (citing *Shreve v. Jessamine Cty. Fiscal Court*, 453 F.3d 681, 687 (6th Cir. 2006)). A jury could find that Mr. Snader was surrendering at the time he was struck in the head, and therefore that the use of the baton was gratuitous. *Id.* at 609. Because the right to be free from a gratuitous strike to the head was clearly established, the officer could not avail himself of qualified immunity, regardless of whether the plaintiff had previously tried to escape. *Id.*

It is also clearly established that unwarranted (that is, gratuitous) "slams" or "takedowns" violate the Fourth Amendment. In a case predating *Baker*, the plaintiff was handcuffed when an officer—thinking the plaintiff had tried to kick another officer—tackled the plaintiff to the floor

and landed on top of him. *Phelps v. Coy*, 286 F.3d 295, 297 (6th Cir. 2002). The officer proceeded to hit the plaintiff in the face twice, and bang his head into the floor three times, despite no evidence showing the plaintiff posed a threat to the officer or anyone else after the officer was on top of him. *Id.* The court applied the Fourth Amendment's excessive force standard and ruled that a jury could find the officer's actions were objectively unreasonable. *Id.* at 301-02.

Similarly, it has been held that officers could not claim qualified immunity when they took down a plaintiff who was handcuffed, surrounded by four jail officials, and complying with orders. *Burgess v. Fischer*, 735 F.3d 462, 474 (6th Cir. 2013); *see also Evans v. Plummer*, 687 F. App'x 434, 442 (6th Cir. 2017) (after *Burgess*, "it is beyond debate that performing a takedown on a detainee who is physically compliant, not a threat, and not attempting to flee violates the Fourth Amendment") (quotation marks omitted); *Darnell v. Carver*, 156 F.3d 1229 (Table) (6th Cir. 1998) (upheld denial of qualified immunity where jury could conclude officer intentionally threw plaintiff to ground and "either pushed [plaintiff's] head into the pavement or lifted it and let it drop").

Thus, it is clearly established law that when an officer gratuitously "slams," "bangs," or performs a "takedown" on a suspect who is handcuffed and not a threat to the officer's safety, the officer has acted in an objectively unreasonable manner.

The instant case differs from these others in one important respect—the force used here was deadly. As discussed, to justify deadly force, the officer cannot just show there was *some* threat, but must have probable cause to believe the suspect poses a *severe* threat of physical harm. *Mullins*, 805 F.3d at 766 (emphasis added). So even a non-gratuitous, but deadly "slam" is not justified, unless the officer is reacting to a severe threat.

Qualified immunity has been denied in instances where the suspect fought back or tried to escape. For example, denial was appropriate when deadly force was used against a plaintiff who

"uttered no threatening remarks toward [the officer] or anybody else; never drew a weapon; struggled with [the officer] in order to flee; did not reach for [the officer's] gun...and broke free from [the officer] and ran away, facing away from [the officer]."[19] *Bouggess v. Mattingly*, 482 F.3d 886, 894 (6th Cir. 2007). Similarly, immunity has been denied to an officer who employed deadly force where "it was an undisputed fact that, after the officer had administered field sobriety tests, the driver dropped to his knees and begged to be released." *Id.* at 895 (discussing facts of *Sigley v. Kuhn*, 205 F.3d 1341 (Table) (6th Cir. 2000). When the officer tried to bring the driver to his feet, the driver tackled the officer and the two began struggling on the ground. *Id.* The driver (whose version of the facts was assumed for summary judgment) claimed he rolled away from the officer, and was then shot twice in the back. *Id.*

The autopsy reveals that Mr. Edwards was under the influence of methamphetamine at the time [D. 124-1, p. 2]. Deputy Burns said, in his experience, methamphetamine could make a suspect "crazy" [D. 124-6, p. 39]. Even if that were true, clearly established law does not necessarily justify the use of deadly force in response. The Sixth Circuit has held such force was not warranted when the officer responded to a disturbance call for a man who was "unclothed, acting erratically, making incoherent statements, yelling for help, and asking to be taken to jail." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013).

In response, Defendants cite *Standifer v. Lacon*, 587 F. App'x 919 (2014). That case admittedly bears some factual similarities to this one. The plaintiff in that case was hallucinating, so her mother called the police. *Id.* at 920. When the police arrived, the plaintiff was in a "flat rage" and refused any help. *Id.* The officer handcuffed the plaintiff, and as the officer walked her to the

---

[19] The court accounted for three factors in the case that are not present here—that the plaintiff was "present at a crack deal," "did not fire [the officer's] gun at [the officer's] foot," and that the plaintiff "was shot three times in the back." *Bouggess*, 482 F.3d at 894.

curb, she kicked him in the groin and ended up on the ground. The parties disputed, like they do here, whether the contact with the ground resulted from a "fall" or a "takedown." *Id.*

There was a key difference in that case—the court had video showing the officer "did not slam, shove, or throw [plaintiff] to the ground; at most he guided her down by pulling her arms up and pushing the rest of her body down—a reasonable response after being kicked in the groin." *Id.* at 924. Further, the court found that all three *Graham* factors cut in the defendant's favor. *Id.* at 924-25. If this Court had video showing Mr. Edwards simply "fell," it could find that excessive force was not used. But a jury could reasonably infer that Deputy Burns did slam Mr. Edwards to the ground, which is what matters at this stage. *Standifer* is therefore distinguishable.

In July of 2016, a reasonable officer should have known that slamming a suspect with enough force to kill him was not an appropriate response where a suspect was handcuffed. Such force is not justified even if the defendant had been behaving erratically, had already fled, and attempted to kick another officer. Thus, the deadly force used by Deputy Burns in "slamming" Mr. Edwards to the ground was not only excessive, it was in violation of clearly established law.

The Court has read the facts in the light most favorable to Plaintiffs, and determined that Deputy Burns violated Mr. Edwards's clearly established constitutional rights when he used deadly force. For that reason, Deputy Burns is not entitled to qualified immunity on Plaintiffs' excessive force claim, and his motion for summary judgment is **DENIED** on this count.

### iii.    Civil Conspiracy—Falsified Report

The final constitutional issue is the motion for summary judgment on Plaintiff's claim of civil conspiracy. Under § 1983, a civil conspiracy is "an agreement between two or more persons to injure another by unlawful action." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (quoting *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007)). To prevail on a civil conspiracy

claim, the plaintiff must show that i) a "single plan" existed; ii) the defendant "shared in the general conspiratorial objective" to deprive plaintiff of her federal constitutional or statutory rights; and iii) the plaintiff was injured by an overt act committed in furtherance of the conspiracy. *Bazzi*, 658 F.3d at 602 (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). Express agreement among all conspirators is not necessary, and each conspirator need not know all the details of the illegal plan, or all the participants involved. *Bazzi*, 658 F.3d at 602 (citing *Hooks*, 771 F.2d at 944).

The claim for a conspiracy must identify an underlying constitutional right that has been violated. In this case, Plaintiffs argue Defendants conspired to violate their constitutional right of access to the courts. [D. 124, p. 27 n. 21; D. 30, ¶ 76].

A plaintiff with a non-frivolous legal claim has a federal constitutional right of "access to the courts." *Flagg v. City of Detroit*, 715 F.3d 165, 173 (6th Cir. 2013) (citing *Christopher v. Harbury*, 546 U.S. 403, 415 n. 12). The right may be "forward-looking" or "backward-looking"; the claim in this case is of the latter variety [D. 124, pp. 30-32]; *see Flagg*, 715 F.3d at 173. In a backward-looking claim, the government is accused of "barring the courthouse door" by concealing or destroying evidence so that the plaintiff cannot ever obtain an adequate remedy on the underlying claim. *Flagg*, 715 F.3d at 173.

To make a backward-looking denial of access claim, the plaintiff must show: i) it had a non-frivolous underlying claim; ii) obstructive actions by state actors; iii) "substantial prejudice" to the underlying claim that cannot be remedied by the court; and iv) a request for relief which the plaintiff would have sought on the underlying claim and is now otherwise unattainable. *Id.* at 174 (citing *Christopher*, 536 U.S. at 415, 421-22 and *Swekel v. City of River Rouge*, 119 F.3d 1259, 1262-64) (internal citations omitted).

According to Plaintiffs, the claim that is now "unattainable" is the excessive force claim they have brought in this case [D. 124, p. 27]. And the Court has just denied Deputy Burns's motion for summary judgment on that very claim. But even if the motion had been granted, that would not have given greater weight to the denial of access claim. The constitutional right protects a person's right to bring a claim *to* a court of law, but it does not guarantee the right to win on that claim. *Flagg*, 715 F.3d at 173 (emphasis added); *see Christopher v. Harbury*, 536 U.S. 403, 420-21 (2002) (noting "requirement that a backward-looking denial-of-access claim provide a remedy that could not be obtained on an existing claim").

In essence, Plaintiffs' argument that Defendants denied them their right to have this claim brought into court fails for the most obvious reason—they have successfully brought this claim into court. The motion for summary judgment on the civil conspiracy claim is therefore **GRANTED**, for both Deputies Burns and Patty.

### d. State Law Claims

Deputy Burns has also moved for summary judgment on state law claims for negligent use of force, battery, and false arrest. In addition, Deputy Burns argues he should not be held liable on claims for wrongful death, and pain and suffering, if the Court grants the motion for summary judgment on the other three claims [D. 44, p. 3 n. 3].

#### i. Negligent Use of Force

*Immunity*

Deputy Burns first seeks immunity from Plaintiffs' state law negligence claim through the Tennessee Governmental Tort Liability Act ("TGTLA") [D. 44, p. 3]. *See* TENN. CODE ANN. § 29-20-101 *et seq.* In general, no party may bring a suit against the "state" except in such manner and in such courts as directed by the Legislature. *Johnson v. City of Memphis*, 617 F.3d 864, 872 (6th

Cir. 2010) (quoting *Davidson v. Lewis Bros. Bakery*, 227 S.W. 3d 17, 19 (Tenn. 2007)). Unless the TGTLA specifies otherwise, it provides blanket immunity for all governmental entities in suits for injuries resulting from the exercise of governmental duties. *Johnson*, 617 F.3d at 871-72; TENN. CODE ANN. § 29-20-201(a).

An exception arises when the plaintiff's injury is proximately caused by a negligent act or omission of any governmental employee acting within the scope of employment. In such a case, governmental immunity is removed, and the employee receives immunity instead. TENN. CODE ANN. §§ 29-20-205 & 29-20-310(b). But an exception (to the exception) is provided for injuries arising out of "civil rights." In those cases the individual employee may be held liable, while the government retains its general shield of immunity. *Id.* § 29-20-205(2); *Johnson*, 671 F.3d at 871-72 (finding civil rights exception applied when plaintiff's claim regarding defendant's negligence arose out of the same circumstances giving rise to her civil rights claim under § 1983). The negligence claim in this case arise from the same facts giving rise to the § 1983 claims [D. 30, ¶ 101], and Deputy Burns is therefore not immune on the former claim under Tennessee law.

*Elements of Negligence Claim*

Plaintiffs seek to hold Deputy Burns liable for his negligent use of force during the arrest [D. 30, ¶¶ 101-06]. To prevail on a claim for negligence, a plaintiff must show that i) a duty of care was owed by defendant to plaintiff; ii) the defendant's conduct fell below the standard of care; ii) there was an injury; iv) defendant's conduct was the cause in fact of plaintiff's harm; and v) defendant's conduct proximately caused plaintiff's harm. *Downs ex rel. Downs v. Bush*, 263 S.W.3d 812, 819 (Tenn. 2008).

In negligence cases involving the excessive use of force during an arrest, Tennessee courts hold defendants to an "objectively reasonable" standard of care. *Butler v. City of Englewood*, No.

1:07-CV-184, 2008 WL 4006786, at *13 (E.D. Tenn. Aug. 25, 2008). That is, the permissible measure of force is "that which an ordinary, prudent, and intelligent person with the same knowledge, and in the same situation as, the arresting officer would have deemed necessary." *Id.* (quoting *McCrary v. City of Memphis*, No. W2004-01840, 2005 WL 452788, at *7 (Tenn. Ct. App. Feb. 25, 2005)). The standard is substantially similar to, if not identical, to the standard for use of force under the Fourth Amendment. *Butler*, 2008 WL 4006786 at *13.

*Exclusivity of Constitutional and State Law Claims*

Regardless, Deputy Burns argues that state law negligence claims and constitutional rights claims are mutually exclusive, citing *Kingsley v. Hendrickson*, 135 S.Ct. 2466 (2015) [*see* D. 46, p. 30 ("[A] defendant cannot be said to be negligent and also a violator o[f] a person's civil rights.")]. In *Kingsley*, the Supreme Court held that "liability for negligently inflicted harm is categorically beneath the threshold of constitutional *due process*." 135 S.Ct. at 2472 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)) (emphasis added).

*Kingsley* addressed a claim brought by a pretrial detainee, alleging excessive force in violation of the Fourteenth Amendment's Due Process Clause. *Id.* at 2470. The Fourteenth Amendment protects pretrial detainees from a use of excessive force that *amounts to punishment*, and is analyzed in accordance with the Eighth Amendment's protection against cruel and unusual punishment—a much higher standard than the Fourth Amendment. *Graham*, 490 U.S. at 395 n. 10 (citing *Bell v. Wolfish*, 441 U.S. 520, 535-39) (emphasis added); *see Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) ("A plaintiff has a substantially higher hurdle to overcome to make a showing of excessive force under the Fourteenth Amendment as opposed to under the Fourth Amendment") (citing *Darrah v. City of Oak Park*, 255 F.3d 301, 306 (6th Cir. 2001)).

Where an excessive force claim is brought by a free citizen, in the context of an arrest or investigatory stop, it is properly brought under the Fourth Amendment, which protects against "unreasonable" searches and seizures. *See Graham*, 490 U.S. at 394. Deputy Burns extrapolates the holding in *Kingsley*, which applied to the Fourteenth Amendment, and suggests it applies to all constitutional claims, even though the two amendments impose different restraints on state actors. By its letter, the Fourth Amendment requires state actors to behave *reasonably* when effecting searches and seizures, and the common law doctrine of negligence requires everyday people to exercise a *reasonable* standard of care. It would be nonsensical to hold that a plaintiff cannot allege both a Fourth Amendment claim and a negligence claim, when the standards both require defendants to behave "reasonably."

Thus, because the Court has ruled there is a genuine dispute of material fact over whether the force used by Deputy Burns was excessive under the Fourth Amendment's reasonableness standard, it likewise rules there is genuine dispute of material fact over whether Deputy Burns's force was excessive under a negligence standard. His motion for summary judgment on the Plaintiffs' claim for negligence is **DENIED**.

### ii. Battery

A cause of action for battery can be proven where an officer has caused damage by an excessive and unprovoked use of force. *Butler*, 2008 WL 4006786, at *14 (citing *City of Mason v. Banks*, 581 S.W.2d 621, 626 (Tenn. 1979). The officer may only use the force reasonably necessary to accomplish an arrest, with regard the specific circumstances, such as the officer's own safety or that of others present. *Id.* Again, because the motion for summary judgment on the claim for excessive force has been denied, the motion is **DENIED** on the state law battery claim.

### iii. False Arrest

To state a claim of false imprisonment (or false arrest), the plaintiff must prove i) the defendant restrained or detained her against her will, and ii) the restraint or detention was unlawful. *See Cunningham v. Sisk*, No. 1:01-CV-182, 2003 WL 23471541, at *18 (E.D. Tenn. Dec. 4, 2003) (collecting Tennessee cases). Thus, Plaintiffs must prove Mr. Edwards was arrested without probable cause or reasonable suspicion. *Id.* The Court has found that Deputy Burns had reasonable suspicion to initially detain Mr. Edwards, and that once Mr. Edwards fled Deputy Burns had probable cause to make an arrest; accordingly, the Court granted summary judgment on this claim. For the same reasons, Defendant's motion for summary judgment on the state false imprisonment claim is **GRANTED**.

### iv. Wrongful Death & Pain and Suffering

Because Defendants have not raised separate arguments for granting the motion for summary judgment on the claims for wrongful death, and pain and suffering—instead tethering these claims to the other state law claims—summary judgment on those claims is **DENIED**.

## IV. MOTION TO DISMISS

Four Defendants have been sued in their official capacity: Blount County Sheriff James L. Berrong, Lieutenant Scott Boyd, Deputy James Patty, and Deputy Jerry Burns. All four now move to dismiss the federal law claims brought against them in this capacity [D. 74].

In general, a suit against an official in her official capacity is the equivalent of a suit against the governmental entity. *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 68 (1989)). As such, an official acting in an official capacity is not a "person" subject to liability for damages under § 1983. *Will*, 491 U.S. at 71.

Plaintiffs agree with this authority. But, they argue it does not follow from this principle that a claim brought against someone in their official capacity should necessarily be dismissed. For support, they cite to *Baar v. Jefferson Cty. Bd. of Educ.*, 476 F. App'x 621, 635-36 (6th Cir. 2012). In that case, the district court adopted a "practical approach" of dismissing the official capacity claims. *Id.* at 635 (quoting *Baar v. Jefferson Cty. Bd. of Educ.*, 686 F. Supp. 2d 699, 704 (W.D. Ky. 2010)). On review, the appellate court found no error in the district court's decision, because the government entity was not ultimately found liable as a matter of law. *Id.* at 636.

The tone of the decision implied that, if the government entity was found liable, the district court's decision to dismiss the official defendants would have been in error, but it did not explain why that would be a problem. Nor is it obvious to this Court why it is a problem; if a suit against an official defendant is the equivalent of a suit against the municipality, then the Court might as well dismiss the unnecessary claim in the absence of a compelling reason to do so.

Indeed, the response to *Baar* has been a collective shrug in the district courts. Some courts took heed and started keeping official defendants in the lawsuit. *See Troutman v. Louisville Metro Dep't of Corr.*, 3:16-CV-742, 2018 WL 6413201, at *3. Other courts (including this one) continue to dismiss official defendants. *See Montano v. Knox Cty.* No. 3:14-CV-404, slip op. at 3-4 (E.D. Tenn. Aug. 25, 2015); *Nissen v. Cty. of Sumner, Tenn.*, No. 3:13-842, 2014 WL 4095085, at *3 (M.D. Tenn. Aug. 19, 2014).

Plaintiffs do give one reason to keep the official defendants around—expediting discovery [D. 118, p. 5]. As justification for the argument that efficient discovery is a valid reason to keep official defendants as parties, they cite to a case from Arizona, *Donahoe v. Arpaio*, No. 10-CV-2756 et al., 2012 WL 6102066 (D. Ariz. Dec. 7, 2012). But that court found the official defendant

was "neither an improper defendant *included solely to facilitate discovery* nor a defendant duplicative of Defendant." *Id.* at *2 (emphasis added). Instead, the plaintiff had (somehow) properly stated a claim against the official himself, and *that* was the reason he should remain in the suit. *Id.*

To the extent Defendants in this case impede discovery, the Federal Rules of Civil Procedure should provide adequate recourse. Absent controlling authority or a persuasive reason to keep the official defendants in this lawsuit, the Court will stick with the practical approach and grant Defendants' motion to dismiss Blount County Sheriff James L. Berrong, Lieutenant Scott Boyd, Deputy James Patty, and Deputy Jerry Burns, in their official capacities.

## V.  CONCLUSION

In conclusion, the Court finds the following. The motion for summary judgment [D. 44], brought by Jerry Burns and James Patty, in their individual capacities is **GRANTED** with respect to claims for unlawful seizure (Count 1 of the Amended Complaint [D. 30]), civil conspiracy (Count 3), and state law false arrest (Count 8). The same motion is **DENIED** with respect to the claims for excessive force (Count 2), negligence (Count 5), battery (Count 6) and Wrongful Death (Count 9). To the extent Plaintiffs seek damages for pain and suffering, along with punitive damages (Count 8), they may do so under the surviving state law tort claims against the individual defendants, and that motion is therefore **DENIED**. Finally, the motion to dismiss brought by Defendants sued in their individual capacities [D. 74] is **GRANTED**.

**IT IS SO ORDERED.**

**UNITED STATES DISTRICT JUDGE**